(34 Misc. Rep. 743.)

GORDON v. ASHLEY.

(Supreme Court, Trial Term, Washington County.   May, 1901.)

ELECTRIC WIRES—NEGLIGENCE—JOINT TORT FEASOR.
    Defendant had strung an electric light wire used in lighting a village so that at times it came in contact with a telephone wire, so as to make a connection with it which might cut the electric wire. Thereafter plaintiff's intestate was killed by coming in contact with the electric wire on its fall after such contact. The danger of such an accident was apparent. *Held*, that defendant could not escape liability by showing that before the accident he had transferred the business, and the plant connected therewith, to a corporation, of which he was a principal stockholder and president.

Action by Louise Gordon against Eugene L. Ashley. Verdict for plaintiff. Motion for new trial denied.

Edgar Hull (Potter & Lillie and C. H. Sturges, of counsel), for plaintiff.

Ashley & Williams (Richard L. Hand, of counsel), for defendant.

RUSSELL, J. The jury gave to the plaintiff, for the benefit of herself as widow and the children of the deceased Joseph Gordon, Jr., a verdict of $4,000, for negligence occasioning the death of the husband at the village of Whitehall, on the night of the 11th of October, 1898. The death came from the breaking of a strung electric wire, and the drop of one part on the person of the deceased, sending a live current through his body. The main ground of negligence claimed was the suspension of the wire across the Champlain canal upon poles too far apart, the distance being about 160 feet, which naturally caused a vibration of the wire, and repeated contact with the guy wire of a telephone pole, causing the melting and severance of the electric wire by heat and attrition. The deceased was a lock-tender, seeking at the moment of the accident partial protection from a storm then raging by the shelter of a small approach bridge leading to the general bridge going over the canal, and happened to be placed in the direct pathway of the falling wire. His death was instantaneous. The jury found specifically that the defendant, Ashley, had personal effective control of the electric plant; that Gordon died from an electric current coming from a wire controlled and operated by the defendant; that the severance and falling of the wire occurred in a manner which might have been reasonably foreseen by the defendant; that the negligence of the defendant caused the death of Gordon; and that no negligence or carelessness of his contributed to his injury; and gave the general verdict of $4,000.

There was sufficient evidence upon which the question of the negli-

gence of some person was properly submitted to the jury. The wire, as originally placed at the distance it was between the two poles, over a public highway, was not all secured by intermediate fastenings so as to be taut enough to prevent vibration and frequent rubbings with the guy wire. Any person skillful enough in the use of the power of electricity to be at all familiar with its rules of action would readily know that contact with another wire would check the flow of the current, and form a local heat, causing a melting at the points of contact, a severance, and dropping of the ends to the earth. Whether such an event would occur soon after the installation of the electric power, or after a period of weeks or months, might not possibly be foreseen. The original source of the danger by the faulty construction remained ever present, and occasionally became visible some time before the accident by the emission of blue flame at the point of contact between the electric wire and the guy wire, so that a jury might reasonably infer notice to the person installing or in charge of the electric plant of the original faulty construction, and its continued menace to any unfortunate who might at the wrong moment be within its reach. Jones v. Railway Co., 18 App. Div. 267, 46 N. Y. Supp. 321.

But a more debatable question remains to be solved. Was the defendant the operator of the electric plant, or was he personally liable for its faulty condition, at the time of the death of Gordon? It is conceded that on the 2d day of February, 1898, eight months before the accident, the defendant obtained from the trustees of the village of Whitehall a contract to perform its lighting service for five years, he not to assign the contract without the written consent of the trustees. He accordingly proceeded to erect and install the electric plant, associating with himself his wife and one of his employés, Elmer J. West. The terms under which the others were associated with him at first are indefinite in their character, and the arrangement was evidently considered as simply transitional, until a corporation should be formed. On the 1st of May, 1898, the plant was ready for service, and furnished light during that month, but no payment was made until the 15th of June for the May service. On the 11th of June the papers for a corporation, called the "Kane's Falls Electric Company," were executed, with a capital of $25,000, divided into 250 shares, of which the defendant had 240, and each of the others 5. No cash payment of the capital was made, but the electric plant was turned over in full payment of the capital; the financing of the construction of the plant having been attended to by the defendant. On the 14th of June a certificate of the corporation was filed in the office of the secretary of state, and on the 15th of June payment was made for the May service to the Kane's Falls Electric Power Company, upon the proper voucher of that company, and monthly payments were thereafter made to this company. That corporation was organized in good faith, for all the purposes for which a corporation of that character might act, and there is nothing in the case to indicate that the transactions under the contract with the village of Whitehall were not thereafter performed by the corporation instead of the defendant, or that his association with the

enterprise was other than that of the principal owner of the corporation and its president. The formal assignment of his contract of February 2, 1898, with the village of Whitehall, to the Kane's Falls Electric Company, was not made until December, 1898, at which time the village consented to the transfer. Up to that time, upon the evidence, the village might have held the defendant, Ashley, responsible under his covenants, whatever equities the Kane's Falls Electric Company might have had as against the defendant. But the liability of the defendant for negligently maintaining a wire which caused death is not measured by the legal rights of the village of Whitehall against him personally. It flows from his duty to the general public to exercise reasonable care that a dangerous power, installed or maintained by him, shall not be hurtful to property or life.

I would therefore have no hesitation in holding, as matter of law, that if the plant had been installed after the creation of the corporation known as the "Kane's Falls Electric Company," June 14, 1898, the responsibility would rest upon the company, and not upon its president and chief owner. I cannot adopt the main argument used by the counsel for the plaintiff to sustain the verdict, that, the transfer papers from the first associates to the corporation being destroyed by fire, the fact of such transfer, and the consequent right of the Kane's Falls Company to maintain and operate the plant, depends upon the testimony of the defendant alone, which the jury might disregard, he being an interested witness. His testimony, in the absence of contradiction, was credible, and was very strongly corroborated by his yielding up the monthly payments as they were made by the village to the corporation, without claim that they belonged to him. There was no apparent motive then, the accident happening months afterwards, to create a corporation to be used merely as a shield, and not as a living organization. I think this action might have been properly maintained against the Kane's Falls Electric Company.

But yet, is the defendant himself not responsible as well as the company? I treat the defendant and this corporation as two different legal entities. It has been held that where an owner organized, under the state banking law, a corporation to serve his own purposes as a mere hollow shell, within which he could disguise his own private action, still, in the interest of the general public, who dealt with the bank on the faith of its assumed compliance with law as a legal entity, it had all the rights of a corporation, and might maintain possession of its own assets against the assignee in bankruptcy of the owner of all there was to the corporation itself. Goodrich v. Remington, 6 Blatchf. 515, 10 Fed. Cas. 611. And a new corporation, absolved from the liabilities of the old one, is not born from the changing of a state bank into a national bank. It is the same identity, under a changed jurisdiction. Bank v. Claggett, 141 U. S. 520, 12 Sup. Ct. 60, 35 L. Ed. 841; Id., 125 N. Y. 729, 26 N. E. 757. I have no doubt that the eye of the law can pierce through the form of a corporation to ascertain its real substance and sustaining power.

But here the very object of the creation of a corporation is to proceed under corporate rights, free from individual responsibility, so far as the corporate charter can work such freedom, and the defendant had the undoubted right, however much or however little he owned of the original enterprise or the new corporation, to protection from the future acts of that artificial body so created. His responsibility for the original construction and the maintenance until the corporation was created lay back of the formation of that corporation. The question is not as to whether a stockholder and officer is liable for the negligence of the corporation itself. It is this: Can he, having created the plant, with its appliances and the dangerous structure complained of, pass over all responsibility for his own act to a corporation in which he has a sufficient control to guard against the danger he has previously instituted and suffered to remain? Has he not, in reckoning with the general public, innocently believing they are protected from risk, a personal duty yet to observe? Assuming that he must have known, as the jury has found, that he had installed and maintained a source of danger to others, can he throw from his own shoulders all burden of legal responsibility by passing over that burden, not to a stranger, but to a corporation, an artificial body, which he largely owned and controlled, without the prudent precaution of advice or an effort to remedy the future risk? He still had the power to accomplish the removal of all cause of danger. He was president of the company, and had, at least, the trustee ownership of the contract with the village. I think that personal responsibility of his was not suddenly terminated by the express or implied transfer of the plant to the new corporation, but yet remained to a sufficient extent to justify the imposition upon him of the consequence of a construction and maintenance which he never undertook to remedy. The responsibility for a defective plan continues, although during the independent execution by another the accident occurs. Colelli v. Concentrating Works, 87 Hun, 428, 34 N. Y. Supp. 310. And the apparent ownership of the right to control, as in this case through the terms of a public contract, gives to one unaware of the real ownership and control a right of action for negligence against the apparent owner, although in fact he was not the original constructor or the present owner. Thomas v. Henges, 131 N. Y. 453, 30 N. E. 238. Any one of several persons liable jointly or within any different degrees of responsibility for negligence may be sued without joining the others. Creed v. Hartmann, 29 N. Y. 591, 86 Am. Dec. 341; Roberts v. Johnson, 58 N. Y. 613; Kain v. Smith, 80 N. Y. 458; Stroher v. Elting, 97 N. Y. 102, 49 Am. Rep. 515. The motion for a new trial is denied.

Motion denied.